**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

VACATION CHARTERS, LTD.,

     Plaintiff,

         v.

TEXTRON FINANCIAL CORPORATION ,

     Defendant.

CIVIL ACTION NO. 3:14-CV-2083

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Defendant Textron Financial Corporation's ("Textron") motion to dismiss (Doc. 25.) Plaintiff Vacation Charters, LTD's ("Vacation Charters") Amended Complaint (Doc. 21.). Textron moves to dismiss Vacation Charters's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Because Vacation Charters has failed to state a claim upon which relief can be granted and because their claims are legally barred by res judicata, or in the alternative, a release signed by the parties, Textron's motion to dismiss will be granted.

## I. Background

Vacation Charters commenced this action against Textron by filing a complaint on October 29, 2014. (Doc. 1.) Textron moved to dismiss all claims on February 9, 2015. (Doc. 19.) On March 2, 2015, Vacation Charters filed an amended complaint as a matter of course. (Doc. 21.) The Amended Complaint asserts claims against Textron for unjust enrichment, promissory estoppel, fraud in the inducement and economic duress or business compulsion. On March 30, 2015, Textron filed a motion to dismiss for failure to state a claim (Doc. 25.) along with a supporting brief (Doc. 26.). On May 15, 2015, Vacation Charters filed a brief in opposition. (Doc. 27) On June 5, 2015, Textron filed a reply brief. (Doc. 30.) The motion has been briefed and is ripe for disposition.

The facts as set forth in the Amended Complaint are as follows:

Vacation Charters is a family business organized in 1978 by W. Jack Kalins ("Kalins") and his wife. (Amended Complaint, Doc. 21. *"Am. Compl."*, ¶ 8.) Vacation Charters was organized to develop and operate timeshare resorts in the Pocono mountain region of Pennsylvania. (*Id*.) The timeshare resorts, including Willowbrook at Lake Harmony, Galleria at Split Rock Resort and Mountain Laurel Resort and Spa, were highly-amenitized and integrated and located on various parcels of property. (*Id*. at ¶¶ 8-9.)   There were approximately five-hundred and forty (540) units configured in one (1), two (2) and three (3) bedroom units with overnight capacity for approximately three thousand (3,000) people. (*Id*. at ¶ 9.) There were numerous amenities on the properties, including year round recreational, dining, lodging, meeting and group facilities. (*Id*. at ¶ 10.) The product offered to purchasers by Vacation Charters consisted of the timeshare interests, the units, and the amenities. (*Id*. at ¶ 11.)

Approximately twenty thousand (20,000) consumers have purchased vacation license interests in, or to the timeshares, from Vacation Charters. (*Id*. at ¶ 12.) The vacation licenses entitled purchasers to future vacations at the timeshares and extended between twenty (20) and ninety-nine (99) years from the date of purchase with the right to exchange the future vacations as timeshare interests. (*Id*.) Purchasers typically paid a down payment of ten (10) to twenty (20) percent on timeshare interests and financed the remaining unpaid balance, plus interest, over five (5) to seven (7) year terms under installment contracts. (*Id*. at ¶ 13.) Approximately fourteen thousand (14,000) purchasers fully complied with their payment obligations, while approximately six thousand (6,000) purchasers were still obligated to remit scheduled installment payments. (*Id*. at ¶ 15.) Vacation Charters used the regularly scheduled installment payments to pay timeshare sales and marketing expenses; to maintain the timeshare properties, including the amenities; and to fund repairs, refurbishments, replacements, taxes, insurance, housekeeping, and maintain certain

common areas for the benefit of the purchasers of the timeshare interests. (*Id*. at ¶ 14.)

Vacation Charters's primary asset was the timeshare receivables that originated with the purchaser finance agreements. (*Id*. at ¶ 17.) Vacation Charters's operation and management of the timeshare properties, interests and amenities relied on the financing of the receivables. (*Id*. at ¶ 18.) Vacation Charters's ownership and financing of the receivables benefitted Vacation Charters because they were able to invest monies into the timeshare properties. (*Id*. at ¶ 19.) Vacations Charters's secondary source of revenue, as provided for in a "Reservation Agreement", was the annual maintenance fees collected from every purchaser, including those who had paid-in-full. (*Id*. at ¶ 20.) These maintenance fees were used to maintain the timeshare properties and the resort amenities and to fund repairs, refurbishment, replacements, taxes, insurance, housekeeping, and the maintenance of certain common areas,  benefitting all purchasers of timeshare interests. (*Id*. at ¶¶ 21-22.)

Vacation Charters's business plan provided that, when approximately eighty-five (85) to ninety (90) percent of available timeshare interests are sold, the maintenance fees and ancillary revenues collected were sufficient to support the timeshare properties and resort amenities for the duration of the timeshare interests. (*Id*. at ¶ 23.) The selling of additional timeshare interests generated additional maintenance fees and additional receivables, which were essential to the success of the timeshare properties and beneficial to Vacation Charters and the purchasers.  (*Id*. at ¶¶ 24-26.) It was necessary for Vacation Charters to maintain the timeshare properties and amenities in order to sell timeshare interests and to provide the purchasers with their timeshare interests.  (*Id*. at ¶¶ 27-28.) When the timeshare properties and amenities are properly maintained, existing purchasers continued to remit payments in connection with their purchase agreements and also continued to pay maintenance fees. *(Id*. at ¶ 29.) However, when the properties and amenities were not

properly maintained, purchasers tended to discontinue remitting payments and maintenance fees. (*Id*. at ¶¶ 30-31.) When the timeshare properties and amenities are properly maintained, prospective purchasers continue to visit and enter into purchase agreements increasing the number and amount of receivables and maintenance fees, but this is not the case when the properties and amenities are not properly maintained. (*Id*. at ¶¶ 32-33.)

In 1997, Vacation Charters entered into an agreement with Litchfield Corporation where Litchfield advanced funds on Vacation Charters's receivables in the amount of five (5) million dollars. (*Id*. at ¶ 23.) In 1999, Textron acquired Litchfield and became the successor in interest to the agreement between Vacation Charters and Litchfield. (*Id*. at ¶ 35.) Textron continued to finance Vacation Charters's receivables through a credit facility called "Hypothecation Loans", which were commercial loans from Textron to Vacation Charters secured by the receivables generated in connection with newly-originated purchase agreements. (*Id*. at ¶ 36.) Vacation Charters serviced the debts to Textron through purchasers' monthly installment payments. (*Id*. at ¶ 37.)

In November 2007, Textron combined Vacation Charters's existing Hypothecation Loans into one consolidated fifty (50) million dollar credit facility. (*Id*. at ¶ 38.) On December 18, 2007, Vacation Charters and Textron entered into a five (5) million dollar revolving loan for two buildings that were being constructed at Willowbrook, one of the timeshare properties. (*Id*. at ¶ 39.)

Since 1997, Vacation Charters relied on financing of the receivables and the borrowing of reinvestment funds to develop, build and maintain the timeshare properties and amenities. (*Id*. at ¶ 40.) Textron knew, through the receipt of regular audited financial statements and other reports, that Vacation Charters relied on reinvestment funds to allow Vacation Charters to direct millions of dollars to the timeshare properties and amenities. (*Id*.

4

at ¶ 41.) Textron knew the reinvestment funds functioned in lieu of reserves for Vacation Charters, that Vacation Charters and the purchasers benefitted from the application of the reinvestment funds to the properties and amenities and that the reinvestment funds were critical and necessary for attracting additional prospective purchasers of timeshare interests. (*Id*. at ¶¶ 42-44.)

For over a decade, Textron and Vacation Charters enjoyed a mutually profitable relationship and the timeshares and purchasers enjoyed excellent exchange ratings from Interval International, a well-recognized timeshare rating and exchange company.  (*Id*. at ¶ 45.) In August 2009, a Valuation and Appraisal Analysis was prepared, estimating the net worth of Vacation Charters as of 2008 to be twenty-nine million, seven thousand (29,007,000) dollars. (*Id*. at ¶ 46.) Vacation Charters owned approximately forty-two million, seven hundred thousand (42,700,000) dollars in current, performing receivables from which approximately one million, three hundred and fifty thousand (1,350,000) dollars in monthly reinvestment funds were derived after debt service. (*Id*. at ¶ 47.) These reinvestment funds were relied on to maintain and improve the timeshare properties and amenities. (*Id*.)

By letter dated December 23, 2008, Textron advised Vacation Charters that it was exiting the "commercial finance businesses not directly related to the financing of Textron products." (*Id*. at ¶ 48.) This letter came at a time when Vacation Charters's timeshares were included among some of the top timeshares in the United States; the properties and amenities were well-maintained; the purchasers received the full benefit of their timeshare interests; there were robust sales of timeshare interests, benefitting Vacation Charters, Textron and the purchasers; and Vacation Charters was not in default. (*Id*. at ¶¶ 49-52.)

Textron began to severely curtail advances on the credit facility to Vacation Charters on their newly-originated purchase agreements which were collaterally assigned to Textron. (*Id*. at ¶ 54.)  The advances, used as reinvestment funds, equaled $ 14,292, 018.19 in

2008; $ 8, 329,139.44 in 2009; $ 3,582,893.75 in 2010; and a total of $ 3,582,893.75 during the months of January, February, April and July of 2011. (*Id*. at ¶ 54, n. 1.)

On March 21, 2009, Textron informed Vacation Charters that the credit facility, expiring May 19, 2009,  and the construction loan, expiring June 17, 2009, would not be renewed, leaving Vacation Charters two (2) months to secure alternate financing for the fifty (50) million dollar credit facility and three (3) months to refinance or pay off the construction loan. (*Id*. at ¶ 55.) As Vacation Charters's primary lender for approximately ten (10) years, Textron had detailed knowledge of Vacation Charters's finances and funding requirements, including the amount of money Vacation Charters needed to reinvest into the timeshare properties and amenities. (*Id*. at ¶ 56.)

Following announcement that it would not renew the credit facility or construction loan, Textron extended the loans. *(Id*. at ¶ 57.) In June 2009, Textron presented an Eighth Amendment to the Consolidated Loan Agreement.  (*Id*. at ¶ 58.) The Eighth Amendment increased interest rates by twenty three point seven (23.7) percent and reduced advances from eighty-five (85) percent, the rate used since November 2009, to seventy two point five (72.5) percent as of August 31, 2011. (*Id*. at ¶ 59.) Vacation Charters was forced to execute the Eighth Amendment due to a lack of other available financing options and with the only alternative being terminating its employees, discontinuing its sales and marketing efforts and shuttering the timeshares, thereby depriving the purchasers of their timeshare interest. (*Id*. at ¶ 61.) After the Eighth Amendment, Textron retained excess collections, depriving Vacation Charters of the ability to direct sufficient reinvestment funds into the timeshare properties and amenities. (*Id*. at ¶ 69.) Textron's retention of excess collections significantly reduced Vacation Charters's available cash flow, damaged Vacation Charters's ability to fund the timeshare projects and amenities and to fulfill its obligations to the purchasers of timeshare interests. (*Id*. at ¶¶ 71-73.) Vacation Charters lost the majority of its sales force,

timeshare sales plummeted, registrations lapsed, and guest flow declined. (*Id*. at ¶ 74.) Vacation Charters eventually defaulted under the Eighth Amendment. (*Id*. at ¶ 75.)

In September 2009, Textron presented Vacation Charters with a Ninth Amendment to the Consolidated Loan Agreement. (*Id*. at ¶ 76.)  The Ninth Amendment failed to provide Vacation Charters sufficient reinvestment funds to operate and maintain the timeshare properties and amenities or to cure the defaults accruing under the Eighth Amendment, and Textron continued to retain excess collections. (*Id*. at ¶¶ 77-79.) Vacation Charters defaulted on the Ninth Amendment. (*Id*. at ¶ 80.)

In January 2010, Textron demanded the execution of a "Reservation of Rights, Consent and Acknowledgment Agreement", under which Vacation Charters was required to cede operations to a Chief Restructuring Officer ("CRO") and pay all costs associated with the CRO. (*Id*. at ¶ 81.) Vacation Charters had no choice but to adhere to Textron's demand and hired a CRO from Huron Consulting Group in May 2010, due to a continued lack of alternative financing and with the only alternative being  terminating its employees and ending the timeshares. (*Id*. at ¶ 83.) The CRO controlled Vacation Charters's day-to-day operations and required payments of twenty-five thousand (25,000) dollars per week, leading Vacation Charters to absorb approximately two million, three hundred thousand (2, 2, 300,000) dollars in costs and expenses. (*Id*. at ¶¶ 84-85. 87.) The costs and expenses of the CRO had a serious impact on Vacation Charters's cash flow and resulted in fewer reinvestment funds for Vacation Charters to direct into the timeshare properties and amenities. (*Id*. at ¶¶ 88-89.)

After the expiration of the January 2010 agreement, Textron conditioned all further funding to Vacation Charters on Vacation Charters's execution of a waiver of rights and confession of judgment in Textron's favor. (*Id*. at ¶ 91.) Vacation Charters again had no choice but to waive its rights and confess to judgment in order to receive reinvestment

funds. (*Id*. at ¶ 93.)

Textron presented Vacation Charters with a Second Amended, Restated and Consolidated Receivables Loan Note in the amount of thirty-eight (38) million dollars that contained a confession of judgment in Textron's favor. (*Id*. at ¶ 97.)  On May 2, 2011, Vacation Charters entered into the agreement in order to receive further funding because it had no choice but to do so. (*Id*. at ¶¶ 97-98.) On May 2, 2011, Textron and Vacation Charters also entered into a Receivables Loan Note in the amount of seven (7) million dollars that also contained a confession of judgment. (*Id*. at ¶¶ 99-100.) Vacation Charters had no choice but to enter into the second agreement in order to receive further funding. (*Id*. at ¶ 100.) Textron refused to provide reinvestment funds and other advances in connection with the notes unless Vacation Charters executed the confessions of judgment and an "Explanation and Waiver of Rights Regarding Confession of Judgment." (*Id*. at ¶¶ 101-103.) The Second Amended, Restated and Consolidated Receivables Loan Agreement dated May 2, 2011, collectively contained all agreements of the parties. (*Id*. at ¶ 104.)

Based on the May 2, 2011 loan agreement and upon written representations made by Textron near and during the time of the May 2011 transaction, Vacation Charters believed it would have a minimum of one (1) year to refinance its obligations and restore its cash flow. (*Id*. at ¶ 105.) However, in April 2011, while under the CRO's control, the CRO failed to remit full payment to another lender, and Vacation Charters suffered a partial payment default to T.D. Bank, triggering a cross-default with Textron. (*Id*. at ¶ 107.) Textron then required Vacation Charters to execute a forbearance agreement waiving its rights to receive notice of any action by Textron in connection with the receivables and purchase agreements, the collateral that secured Vacation Charters's payments under the May 2011 loan agreement. (*Id*. at ¶ 108.)

From the time of the Eighth Amendment through September 2011, Textron retained

8

over eighteen (18) million dollars in excess collections, much of which, during the parties' relationship prior to the Eighth Amendment, Vacation Charters would have reinvested in the timeshare properties and amenities for the benefit of Vacation Charters and the purchasers. (*Id*. at ¶ 109.)

On September 20, 2011, Textron conducted an auction under the Uniform Commercial Code ("UCC") and converted its security interest in Vacation Charters's receivables and collaterally assigned the purchase agreements into an ownership interest by purchasing the receivables and purchase agreements with a $ 28,170,062 million credit bid. (*Id*. at ¶ 111.)  The face value of the receivables and purchase agreement exceeded thirty nine (39) million dollars.  (*Id*. at ¶ 112.) In October 2011, Textron filed a complaint in confession of judgment against Vacation Charters in the Middle District of Pennsylvania seeking, among other types of relief, the appointment of a receiver. (*Id*. at ¶ 115.) On November 9, 2011, a receiver was appointed by this Court to manage the timeshare properties. (*Id*. at ¶ 125.)

In the Summer of 2011 through the Winter of 2012, representatives of Textron promised Vacation Charters that it would release Mountain Laurel to a Kalins Purchaser, free and clear of any encumbrances;  promised to provide fifteen year low interest financing to Vacation Charters, or its designees, to refurbish and repair Mountain Laurel; to forgive all guarantees in connection with Textron financing to Vacation Charters; and to compensate Kalins to collect receivables.  (*Id*. at ¶¶ 116-119.) Vacation Charters would have objected to the receiver action and appointment of the receiver without Textron's promises. (*Id*. at ¶¶ 120-123.) However, relying on the promises, Vacation Charters did not object. (*Id*. at ¶ 124.) Afterwards, Textron refused to honor its promises. (*Id*. at ¶ 126.) And in October 2011, the Textron Group President admitted that Textron's loan portfolio with Vacation Charters should have been handled differently. (*Id*. at ¶ 110.)

9

On August 15, 2013, Stabilis Split Rock, JV, LLC ("Stabilis") purchased Textron's ownership interest in the receivables, the purchase agreements and Textron's judgment against Vacation Charters. (*Id*. at ¶ 132.) On August 8, 2014, Stabilis purchased the assets of Vacation Charters at a Sheriff Sale conducted in the Carbon County Court of Common Pleas, Carbon County, Pennsylvania. (*Id*. at ¶ 133.) At the time of the Sheriff's Sale, the 2014 real estate tax assessment for Vacation Charters's real property amounted to $ 20,349, 621.00, based on fifty (50) percent of the fair market value. (*Id*. at ¶ 135.) Therefore, the rounded fair market value of the property was forty million (40,000,000) dollars in August 2014. (*Id*.)

Timeshare unsold inventory at Willowbrook, Galleria and Mountain Laurel totaled one hundred and seven million, four hundred thousand (107,400,000) dollars as of September 2014 and the net value of the unsold timeshare inventory, after marketing expense of forty six (46) percent, was approximately fifty eight (58) to sixty two (62) million dollars. (*Id*. at ¶ 134.)

Vacation Charters has been damaged in an amount not less than sixty million (60,000,000) dollars. (*Id*. at ¶ 138.)

Based on the foregoing, Vacation Charters filed an Amended Complaint (Doc. 21.) asserting claims of unjust enrichment, promissory estoppel, fraud in the inducement and economic duress or business compulsion against Textron. Textron has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Textron also asserts that Vacation Charters's claims are barred through execution of a release of all claims, res judicata, Vacation Charters's failure to plead fraud claims with particularity as required by Federal Rule of Civil Procedure Rule 9(b), and that some or all of Vacation Charters's claims are time-barred. (Doc.26.) Textron requested oral argument on their motion. (Doc. 26.) The request was granted, and oral

argument was held on January 21, 2016.  The motion is now ripe for disposition.

## II. Discussion

### A.    12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000).  The Court does not consider whether a plaintiff will ultimately prevail. *See id*.  A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The statement required by Rule 8(a)(2) must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Detailed factual allegations are not required. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.  However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id*.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).  As such, "[t]he touchstone of the pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679, 129 S. Ct. 1937.

In deciding a motion to dismiss, the Court should consider the complaint, exhibits attached to the complaint, and matters of public record. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Pension Benefit Guar.*, 998 F.2d at 1196. The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory*

*Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)).

### B.      Motion to Dismiss the Amended Complaint

Vacation Charters alleges that execution of the Eighth and Ninth Amendments, agreement to the appointment of the CRO, and the execution of the confession of judgment and waiver, were because Vacation Charters was "without a legal remedy" and was placed "in a position that eliminated Vacation Charters' [sic] exercise of free will." (*Am. Compl.*, ¶ 169.) Vacation Charters states Textron knew that Vacation Charters would be forced to take the above actions, or have "to terminate its employees, discontinue its sales and marketing efforts, and shutter the Timeshare projects depriving the Purchasers of their Timeshare Interests and future vacations." (*Id.* at ¶ 168) Count I of the Amended Complaint is a claim of unjust enrichment and underlying the claim is a challenge to the enforceability of the parties' agreement. Therefore, Count IV, alleging economic duress or business compulsion will be addressed first being that the outcome of Count IV  impacts Vacation Charters's other claims and Textron's asserted defenses.

The Court retains diversity jurisdiction pursuant to 28 U.S.C. § 1332. Consequently, Pennsylvania substantive law applies. *Morrison v. AccuWeather, Inc.*, No. 4:14-CV-0209, 2015 WL 4357346, at *1 (M.D. Pa. July 14, 2015); *See, e.g., Erie R. Co. v. Tompkins,* 304 U.S. 64, 91–92, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### 1.      Count IV–Economic Duress/Business Compulsion.

### a.      Failure to State a Claim

As stated above, Vacation Charters alleges that they were "forced" into taking the actions demanded by Textron. (*Am. Compl.*, Count IV**.**)  Vacation Charters "believes that the various loan agreements and their amendments referenced in its Complaint were products of coercion and duress and therefore invalid and unenforceable." (Doc. 27, 21.)

"Economic duress, *i.e.,* business or economic compulsion, is a form of duress" and

has been defined as follows:

> To constitute duress or business compulsion there must be more than a mere threat which might possibly result in injury at some future time, such as a threat of injury to credit in the indefinite future. It must be such a threat that, in conjunction with other circumstances and business necessity, the party so coerced fears a loss of business unless he does so enter into the contract as demanded.

*McDonald v. Whitewater Challengers, Inc.*, 2015 PA Super 104, 116 A.3d 99, 114-15 (2015) (citing *Tri–State Roofing Co. of Uniontown v. Simon,* 187 Pa.Super. 17,  20-21, 142 A.2d 333, 335 (1958)).However, "under Pennsylvania law where the contracting party is free to come and go and to consult with counsel, there can be no duress in the absence of threats of actual bodily harm." *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 893 (3d Cir. 1975) (citing *Carrier v. Wm. Penn Broadcasting Co.*, 426 Pa. 427, 430-31, 233 A.2d 519 (1967))."Economic duress ordinarily makes a contract voidable, not void," which is an important distinction because the voidable agreement may be ratified by the party that acted under duress. *Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 695 (E.D. Pa. 1993)(citing *Agathos v. Starlite Motel,* 977 F.2d 1500, 1506 (3d Cir.1992)); Restatement (Second) of Contracts § 174 cmt b (1981).

 In *Three Rivers Motors Company*, a car dealership franchisee sought to set aside a release arguing it had been signed under duress. 522 F.2d 885.  The parties entered into an agreement that the franchiser would repurchase unsold inventory upon the signing of a general release of claims against the franchisor. *Id.* at 887.  The  franchisee argued that the release was the product of duress because the franchisor would not repurchase the inventory without such and "there was no other available market where the items could be sold." *Id*. The court held the economic conditions did not suffice to demonstrate duress because there was no allegation of a threat of bodily harm and both parties were represented by counsel. *Id*.

 Textron relies on *Three Rivers Ford Motor Company* in support of their argument that

14

Vacation Charters has alleged nothing more than harsh financial consequences had they not executed the agreements. Textron additionally argues that Vacation Charters's claims that they were without legal remedy and deprived of their free will are legal conclusions, unsupported by facts. (Doc. 26, 19.)

Vacation Charters relies on *Litten v. Johnson Logan, Inc.*, 220 Pa.Super. 274, 286 A. 2d 913 (1971) to argue that the threat of serious financial loss may constitute duress. (Doc. 27, 22.) However, as Textron points out, the Pennsylvania Superior Court was applying New York law to the case before it. *See Degenhardt v. Dillon Co.*, 543 Pa. 146, 157, 669 A.2d 946, 952 (1996)("*Litten,* however, does not represent controlling authority in this Court; thus appellee's reliance on *Litten* is misplaced."). In fact the Pennsylvania Supreme Court, reaffirmed "the rule of law . . . that a party who has a reasonable opportunity to consult with legal counsel before entering into a contract cannot later invalidate the contract by claiming economic duress." *Degenhardt*, 543 Pa. at 157, 669 A.2d at 952. Additionally, the facts of *Litten* are distinguishable from the current case. In *Litten,* the plaintiffs and defendant entered into an oral agreement, with various provisions, but primarily for the defendant to acquire plaintiffs' business. *Litten*, 286 A.2d at 279-80. After transfer of the business, the defendant refused to pay plaintiffs' creditors as promised unless plaintiffs signed a subsequent written agreement that did not contain the provisions previously orally agreed to. *Id.* Plaintiffs were being threatened with bankruptcy by their creditors and the plaintiffs' attorney was the brother of the defendants' attorney. *Id.* The court affirmed that the "defendant and only defendant had the choice of preventing bankruptcy for the corporation and personal financial disaster for plaintiffs." *Id.* at 281.

Vacation Charters's argument that "[d]iscovery in this case will clearly demonstrate that TFC [Textron] knew that these loan agreements would cause serious cash flow problems affecting Vacation Charters' ability to operate the resort and avoid defaults," is not

analogous to the situation in *Litten*, even if the case was controlling. *Litten* involved a situation where the plaintiffs no longer had control of the assets of their business and were faced with potentially immediate financial ruin on the day the agreement was signed. Such is not the case here. Despite the unfortunate financial constraints Vacation Charters eventually confronted, they have failed to plead a plausible claim under the applicable Pennsylvania duress law. They have failed to allege they did not have the opportunity to consult with counsel before signing any of the agreements, nor have they alleged a potential for physical harm. In fact the documents attached to Vacation Charters's Amended Complaint indicate that Vacation Charters had an opportunity to consult with counsel. (Doc. 22, Ex. O, ¶ 16; Ex. P, ¶ 16; Ex. Q,  ¶ 1; Ex. R,  ¶¶ 20.2; 23.33.) Additionally, Vacation Charters has not pled that they were faced with immediate financial ruin in the face of the various agreements, only the possibility of future financial difficulties. Vacation Charters has simply failed to state a claim for economic duress under Pennsylvania law. Therefore, Textron's motion to dismiss will be granted.

Vacation Charters contends that this Court has not yet determined and cannot determine from the pleadings as a matter of law that the relevant terms of Vacation Charters relationship to [Textron] was governed by valid and enforceable contracts." (Doc. 27, 21.) However,  they have not pled any other bases for invalidating the parties' agreements, and because a duress claim has not been adequately pled, the agreements before me are valid and shall be given their full force and effect. Therefore, I will turn to the remaining claims in light of that determination.

b.     Release[1]

Textron additionally argues that the release contained in the August 2011 Forbearance Agreement released Textron from all claims Vacation Charters may have had against them at the time, and additionally, any future claims. (Doc. 26, 27.) Vacation Charters counters that the "Forbearance Agreement, signed in 2011, was one of a series of agreements that Vacation Charters was compelled by duress and forced to enter and therefore may be invalid and unenforceable." (Doc. 27, 25.) However, having determined that Vacation Charters has not pled duress, the release must be evaluated.   A "Court is empowered, on a Federal Rule of Civil Procedure 12(b)(6) motion, to examine documents upon which the Plaintiff relies in its complaint and which are 'undisputably authentic.'" *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 525 (W.D. Pa. 2011) No one is disputing the authenticity of the various agreements, rather Vacation Charters is challenging the enforceability of the agreements.

The release[2] sets forth:

---

[1]

A release is an affirmative defense. *See* Fed. R. Civ. Pro. 8(c). However, "the law of this Circuit (the so-called 'Third Circuit Rule') permits an affirmative defense to be raised by a motion under Rule 12(b)(6) in certain circumstances. *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 525 (W.D. Pa. 2011); *See Three Rivers Ford Motor Co.*, 522 F.2d 885 (affirming dismissal of an action based on a release raised in a 12(b)(6) motion).

[2]

*See Pension Ben. Guar. Corp.*, 998 F.2d at 1196 ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."). The agreement and releases were attached to Vacation Charters's Amended Complaint.

17

## ACKNOWLEDGMENT AND RELEASE.

**a. *RELEASE OF LENDER PARTIES.* BORROWER AND KALINS EACH ACKNOWLEDGE AND AGREE THAT (I) THE INDEBTEDNESS, SECURITY INTERESTS AND OTHER LIENS GRANTED TO THE LENDER SECURING THE INDEBTEDNESS ARE VALID AND PERFECTED IN ACCORDANCE WITH APPLICABLE LAW; (II) THE INDEBTEDNESS IS NOT SUBJECT TO ANY SETOFF, DEFENSE, CLAIM, COUNTERCLAIM, RECOUPMENT, OR AVOIDANCE AND/OR SUBORDINATION UNDER THE BANKRUPTCY CODE OR OTHERWISE; AND (III) THE BORROWER AND KALINS HOLD NO CLAIMS AGAINST THE LENDER OR LENDER'S OFFICERS, AGENTS, DIRECTORS, REPRESENTATIVES, EMPLOYEES, AFFILIATES, ATTORNEYS, PROFESSIONALS AND SUCCESSORS AND ASSIGNS AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AND EMPLOYEES (COLLECTIVELY, THE *"LENDER PARTIES"*). TO THE EXTENT THAT BORROWER OR KALINS HOLDS ANY CLAIMS AGAINST ONE OR MORE OF THE LENDER PARTIES, INCLUDING BUT NOT LIMITED TO CLAIMS RELATING TO OR ARISING FROM THE LOANS, THE TFC FINANCING DOCUMENTS AND ADMINISTRATION THEREOF OR COLLECTION OF AMOUNTS DUE THEREUNDER, OR ANY APPLICATIONS, DISCUSSIONS, AND/OR COMMITMENTS TO ENTER INTO ANY FINANCE TRANSACTION, FORBEARANCE AGREEMENTS, AND/OR AGREEMENTS PRIOR TO THE DATE OF THE EXECUTION OF THIS AGREEMENT, AS CONSIDERATION FOR LENDER'S UNDERTAKINGS UNDER THIS AGREEMENT, THE BORROWER AND KALINS EACH HEREBY UNCONDITIONALLY COVENANTS NOT TO SUE ANY LENDER PARTIES AND FOREVER RELEASES, DISCHARGES, AND ACQUITS THE LENDER PARTIES OF ANY AND ALL CLAIMS, BREACHES OF CONTRACT, DEBTS, SUITS, DEMANDS, CAUSES OF ACTIONS AND ACTIONS OF ANY TYPE OR NOTICE WHICH AROSE OR ARE BASED ON OCCURRENCES OR TRANSACTIONS WHICH TOOK PLACE PRIOR TO THE DATE OF THIS AGREEMENT, WHETHER KNOWN OR UNKNOWN, CONTINGENT OR LIQUIDATED, SUSPECTED OR UNSUSPECTED, AT LAW OR IN EQUITY, OR BASED IN CONTRACT OR IN TORT , BORROWER AND KALINS EACH ACKNOWLEDGE AND REPRESENT THAT THEY HAVE HAD THE OPPORTUNITY TO RECEIVE THE ADVICE OF COUNSEL IN CONNECTION WITH THIS ACKNOWLEDGMENT AND RELEASE AND HAD VOLUNTARILY ENTERED INTO THIS ACKNOWLEDGMENT AND RELEASE.**

**EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 18.**

(Doc. 5, Pl's Ex. S*., ¶* 18, pp. 20-21.) "A signed release of claims is binding upon parties to an agreement unless executed and procured by 'fraud, duress, or other circumstances sufficient to invalidate the agreement.'" *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 525 (W.D. Pa. 2011). Vacation Charters has not sufficiently  pled duress and therefore, the signed release is binding. Additionally, when the above release was executed in August 2011, Vacation Charters had already executed both the Eighth and Ninth Amendments that contained the following language:

> 15. **Reaffirmation, Confirmation and Incorporation of Waivers and Confession of Judgment.** As an inducement to Lender to enter into this Amendment, Borrower hereby affirms, restates and incorporates herein by reference, as of the date hereof and prior to giving effect to this Amendment, all waivers of Borrower contemplated by the Loan Documents, including, but not limited to, **Section 24.31** of the Loan Agreement (regarding waiver of right to trial by jury), all of such waivers hereby being made part of this Amendment. Borrower expressly ratifies and confirms the confession of judgment provision contained in **Section 16** of the Receivables Loan Note.

(Doc. 22, Ex. M,¶ 15, p. 5.) These agreements release Textron from any claims that Vacation Charters may have had at the time or following the execution of such. These releases also reiterate and restate releases contained in the parties' prior agreements. (Doc. 22, Ex. B, 17-18.) Because  "[d]uress is not established merely by showing that the release was given under pressure of the financial circumstances . . ." *Three Rivers Motors Co.*, 522 F.2d at 893.

Vacation Charters alleges that the excess collections began with the execution of the Eighth Amendment and continued onward. The release clearly states that any such claims were released. Vacation Charters alleges that the above releases were the product of duress, however, having determined that a claim for duress has not been sufficiently pled, the release is effective barring claims made by Vacation Charters that. Additionally, the document executed in August 2011 contained the following clause:

> 28.   **Advice of Counsel.** The parties to this agreement have received the advice of counsel in the negotiation and execution of this Agreement.

(Doc. 5, Pl's Ex. S*., ¶* 28, p. 25.) Vacation Charters affirmed they had the opportunity to and consulted with counsel. Because "there can be no duress where the contracting party is free

to come and go and to consult with counsel before assuming new contractual obligations," Vacation Charters cannot now claim economic duress. *Degenhardt*, 543 Pa. at 155, 669 A.2d at 951.

### c.     Acceptance of Benefits/Time-Barred

Textron alternatively argues that Vacation Charters's acceptance of benefits under the agreements now precludes their claim of duress. (Doc. 26, 35.) Vacation Charters contends they "did not possess any real power of avoidance of [Textron's] forced agreements, nor did it realize any real benefits from those agreements." (Doc. 27, 36.) Further alleging that Textron "knew that the terms and conditions of these various agreements would lead to further debt, defaults and eventually Vacation Charters' loss of control of the resort." (Doc. 27, 36.) Power of avoidance based on business coercion is lost when the party affirms the transaction. *Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp.,* 243 Pa. Super. 101, 113-14, 364 A.2d 470, 476 (1976) "Ratification results if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract." *Id.* at 114.

Vacation Charters did not file the instant suit until October 2014. The Eighth Amendment was executed in May of 2009, the Ninth in September 2009, and the CRO was agreed to in May 2010. The continuing financing of Vacation Charters's operation, albeit with cash flow problems, was a benefit. Textron could have walked away from the financing. Vacation Charters clearly accepted benefits from the agreements and therefore, they affirmed the agreements, precluding a claim for duress. Even if Textron knew that the agreements would lead to financial difficulty for Vacation Charters, it does not erase the fact that Vacation Charters executed the agreements and accepted benefits thereunder.

Additionally, Textron argues Vacation Charters's claims are barred by the applicable statute of limitations because the "alleged duress associated with the entry into the Eighth and Ninth Amendments in May and September 2009, and the agreement to a CRO in May 2010. . . would be barred by limitations. . . because all of the relevant events occurred more

than four years before suit was filed." (Doc. 26, 36.) Under Pennsylvania law, a contract claim is to be brought within four years,[3] and there is a four-year statute of limitations for unjust enrichment causes of action. *Sevast v. Kakouras*, 591 Pa. 44, 53, 915 A.2d 1147, 1153 (2007). "A statute of limitations defense may be asserted on a motion to dismiss only where it is clear from the face of the complaint that the claims are time-barred." *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 785 (E.D. Pa. 2008) (citing *Rycoline Products, Inc. v. C & W Unlimited,* 109 F.3d 883, 886 (3d Cir.1997)). But if the time bar is not apparent on the face of the complaint, "then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bucci*, 591 F. Supp. 2d at 785. (citing *Bethel v. Jendoco Const. Corp.,* 570 F.2d 1168, 1174 (3d Cir.1978)). Vacation Charters argues that the discovery rule applies to their claims stating that "because the judgment was not purchased until August 15, 2013 and the assets were not purchased until August 8, 2014, the statute has not expired." (Doc. 27, 34-35.) "The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." *Crouse v. Cyclops Indus.*, 560 Pa. 394, 404, 745 A.2d 606, 611 (2000) (citing *Pearce v. Salvation Army,* 449 Pa.Super. 654, 657-59, 674 A.2d 1123, 1125 (1996)). Despite Vacation Charters's failure to expand on when they allege the duress claim was discovered, it is not clear from the face of the complaint that the claims are time-barred. Therefore, the claims will not be dismissed based on the statute of limitations, but rather for the reasons stated above.

---

[3]

(a) General rule.--Except as provided for in subsection (b), the following actions and proceedings must be commenced within four years:
. . .
(4) An action upon a contract implied in law, except an action subject to another limitation specified in this subchapter.

42 Pa. Stat. and Cons. Stat. Ann. § 5525 (West)

#### d.    No damage

Textron argues that because Vacation Charters has not alleged that Textron was obligated to continue lending to Vacation Charters, they, therefore, did not owe a legal duty to Vacation Charters. (Doc. 26, 29-30.) Additionally, they argue that continued financing delayed the inevitable for Vacation Charters because without such, they would have had to shut down the business, as alleged by Vacation Charters in the Amended Complaint. (*Id*. at 30.) Vacation Charters counters that the Textron "knowingly and intentionally engaged in a series of improper efforts, including forcing Vacation Charters to enter into various loan agreements and their multiple amendments, which were specifically designed to liquidate the assets of Vacation Charters at the expense of the resort." (Doc. 27, 37.) Because I have determined that Vacation Charters's claim for duress will be dismissed on other grounds, I will not address Textron's contention.

#### e.    Res Judicata[4]

Textron finally argues that any claim for duress by Vacation Charters is barred by res judicata. (Doc. 26, 37.) A confession of judgment action was filed in this Court and docketed at No. 11-CV-1957. Vacation Charters sought to strike or open the judgment but Textron argues it never asserted that the revised agreements were the result of duress during those proceedings. *(Id.)* Vacation Charters counters that the issue of duress was not raised when seeking to open or strike the judgment because Vacation Charters was simply contesting the amount of credit and attorneys' fees provisions, not the underlying confession of

---

[4]

Res judicata is also an affirmative defense. *See* Fed. R. Civ. Pro 8(c.). However, the Third Circuit has stated that an affirmative defense can be grounds for dismissal in a 12(b)(6) motion. *Rycoline Products, Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997) (extending the holding in *Bethel v. Jendoco Constr. Corp.,* 570 F. 2d 1168, 1174 (3d Cir. 1978) to permit all affirmative defenses to be considered in a 12(b)(6) motion).

judgment. (Doc. 27, 38.)

"It is hornbook law that the final determination by a court of competent jurisdiction settles not only the defenses actually raised, but also those which might have been raised." *Duquesne Light Co. v. Pittsburgh Railways Co.*, 413 Pa. 1, 5, 194 A.2d 319, 321 (1963)**.** "According to Pennsylvania law, a judgment by confession operates as res judicata and bars examination 'of that judgment or any other claims arising out of the same transaction or nucleus of events.'" *Klecha v. Bear*, 712 F. Supp. 44, 46 (M.D. Pa. 1989) (citing *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 139-140, 464 A.2d 1243, 1268 (1983)). Decisions of Pennsylvania courts have held consideration of subsequent suits claiming defenses is barred when those defenses could have been presented in the original petition to open. *Riverside Mem'l Mausoleum, Inc. v. UMET Trust*, 581 F.2d 62, 67 (3d Cir. 1978)(citing *Nevling v. Commercial Credit Co.*, 156 Pa.Super. 31, 39 A.2d 266 (1944)); *see also Duquesne Light Co.,* 413 Pa.1.

Upon review of the motion to strike or open the confession of judgement, Vacation Charters failed to raise duress as a basis for striking or opening the judgment. (No. 11-CV-195, Doc. 31.) Vacation Charters's argument that res judicata does not apply fails to acknowledge the settled law, and fails to acknowledge that when requesting to strike or open the judgement, they could have and should have sought to invalidate the agreements in which the confession of judgments were contained.  Vacation Charters failed to raise an available defense at a prior proceeding that arose from the same series of transactions, and therefore, their duress claim is barred by res judicata.

## 2.    Unjust Enrichment

Vacation Charters alleges Textron retained over eighteen (18) million dollars in excess collections to the detriment of Vacation Charters, and under the parties' previous funding relationship, most of those funds would have been reinvested in the timeshare properties and amenities. (*Am. Compl.,* ¶¶ 140, 142.) Vacation Charters alleges it was inequitable for Textron to retain the excess collections following the execution of the Eighth Amendment and continuing until September 2011. (*Id.* at ¶ 144.) Textron moves to dismiss

the unjust enrichment claim arguing that the parties' relationship was governed by express contract, and therefore, Vacation Charters cannot assert an unjust enrichment claim. (Doc. 26, 24.) Textron asserts, in the alternative, that Vacations Charters's claims are precluded by the execution of the release as discussed above. (*Id.* at 27.)Vacation Charters responds that claims for unjust enrichment can be brought where questions exist as to the validity of the contracts in question, asserting that they were acting under duress when the agreements were executed. (Doc. 27, 19-20.)

Pennsylvania law sets forth the elements of a claim for unjust enrichment as follows: "(1) the plaintiff conferred a benefit upon the defendant; (2) an appreciation of such benefits by the defendant; and (3) the defendant accepted and retained such benefit under circumstances where it would be inequitable for the defendant to retain the benefit without payment of value." *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 780 (M.D. Pa. 2008) (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 447 (3d Cir.2000)). "[U]njust enrichment is a quasi-contractual doctrine and is inapplicable if the parties' relationship "is founded on a written agreement or express contract." *Cunningham v. M & T Bank Corp.*, No. 1:12-CV-1238, 2013 WL 5876337, at *7 (M.D. Pa. Oct. 30, 2013) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987)) (citations omitted). However, "[a] plaintiff is permitted to plead alternative theories of recovery based on breach of contract and unjust enrichment in cases where there is a 'question as to the validity of the contract in question.'" *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012).

Vacation Charters does not allege a breach of contract. They do not allege that Textron violated a provision of their agreements by retaining excess collections or that they were required, by any of the agreements, to return any excess collections to Vacation Charters to reinvest. As I have determined that Vacation Charters has failed to plead a basis to set aside the parties' agreements, there is no basis to permit discovery on a claim that is controlled by the agreements attached to the Amended Complaint.

Even if assuming *arguendo* that the agreements were invalidated, Vacation Charters

24

has failed to plead a claim for unjust enrichment. "[T]o sustain a claim of unjust enrichment, the claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." *Hershey Foods Corp.,* 828 F.2d at 999. Vacation Charters has not pled that Textron was not entitled to keep the excess collections, and simply stating that such may have been returned in the past does not suffice. They have failed to also plead why it was inequitable for Textron to retain the excess collections. A conclusion without supporting facts cannot withstand the motion to dismiss.

### 3.    Promissory Estoppel

Textron moves to dismiss Count II of the Amended Complaint arguing that any promises allegedly made by Textron cannot be enforced by promissory estoppel. (Doc. 26, 29.) "Promissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise." *Carlson v. Arnot-Ogden Mem'l Hosp.,* 918 F.2d 411, 416 (3d Cir. 1990) (citing *Cardmone v. Univ. of Pittsburgh,* 253 Pa.Super. 65, 74, 384 A.2d 1228, 1233 (1978)). "To succeed on a promissory estoppel claim, the plaintiff must further establish that the action he took 'amounted to a substantial change of position.'" *Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408, 421-22 (W.D. Pa. 2009) (citing *Ankerstjerne v. Schlumberger Ltd.,* 155 Fed.Appx. 48, 51 (3d Cir.2005); *Kaufman v. Mellon Nat'l Bank and Trust Co.,* 366 F.2d 326, 332 (3d Cir.1966)).

Vacation Charters alleges that representatives of Textron promised to release Mountain Laurel Resort and Spa to a Kalins's[5] purchaser, free and clear of any encumbrances; provide fifteen (15) year low interest financing to Vacations Charters or its designee to refurbish and repair Mountain Laurel; forgive all guarantees in connection with

---

[5]Kalins is a principal of Vacation Charters, LTD. (*Am. Compl.,* ¶ 8.)

the Textron financing to Vacation Charters; and compensate W. Jack Kalins to collect receivables. (Doc. 27, 27.) These promises were allegedly made during the Summer of 2011 and through the Winter of 2012. (*Id.* at 28.) Vacation Charters argues that they "would have objected to the Receiver Action and the appointment of a receiver absent certain promises made by [Textron] concerning the release of Mountain Laurel Resort and Spa." (*Id.* at 28.)

An action was brought in this Court for the appointment of a receiver. (*Textron Financial Corp. v. Vacation Charters, LTD*, No. 3-11-CV-1957.) On November 9, 2011, a hearing was held before me and the appointment of a receiver was consented to by counsel for Vacation Charters. (Doc. 26, Ex. 1, *Transcript of Hearing,* November 9, 2011, at 18-19, *Textron Financial Corp. v. Vacation Charters, LTD.*, 11-CV-1957.) Vacation Charters's counsel stated that Vacation Charters was suffering a cash crunch, (*Id.*) however, nothing was mentioned during the hearing regarding the promises that were allegedly made.

Textron moves to dismiss the promissory estoppel claim and argues that Vacation Charters had previously consented to the appointment of a receiver in the event of a default, before any alleged promises were made, and therefore, Textron could not have expected that any promises it made would induce Vacation Charters to refrain from objecting to the appointment of receiver. (Doc. 26, 29.) Vacation Charters counters Textron's arguments stating that Vacation Charters suffered the loss of the resort due to the failure of Textron to keep certain promises and could have alternatively filed a bankruptcy action.[6] (Doc. 27, 29.) Vacation Charters additionally argues that the acknowledged cash

---

[6]

Vacation Charters has added that they could have sought bankruptcy protection in the alternative in their brief in opposition . However, they do not expand on their alleged alternative, *e.g.,* when and in response to what it was available. The possibility that Vacation Charters could have sought protection through bankruptcy was not alleged in the Amended Complaint and therefore is  not before me. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).

crunch that Vacation Charters was suffering was caused by Textron and does not undermine the plausibility of a claim for alleged promises made but not kept. (*Id.*)

Despite the fact that Vacation Charters has stated that promises were made to them and not kept, it cannot be said as a matter of law that they have pled a claim for promissory estoppel. The parties' various agreements, attached to the Amended Complaint,  state that Vacation Charters consented to a receiver if a default occurs. (Doc. 22, Ex. B, 17(". . .consented to the appointment of such receiver."); Ex. M, 6 ("13.1 Ratifies, confirms and acknowledges that the Loan Agreement, as amended hereby, and all other Loan Documents continue to be valid, binding and in full force and effect as of the date of this Amendment, and enforceable in accordance with their terms. "); Ex. N, 4 (same).) Vacation Charters ignores these contractual provisions that were executed prior to the receiver action and has not alleged why Textron would reasonably believe Vacation Charters would rely and refrain from contesting appointment of a receiver. Nor for that matter why Textron would need to make such promises, because even if the promises had not been made, Textron could have still sought the appointment of a receiver pursuant to their agreements.

Vacation Charters has also failed to plead action or forbearance on their part as a result of the promises that amounted to a substantial change in position.  Alleging that they refrained from objecting to the receiver based on the promises fails to provide factual support for how the situation would have been different without the receiver. Alternatively, Vacations Charters states that "protection through bankruptcy was a viable option.[7] However, promises made by [Textron] convinced Vacation Charters to refrain from objecting to the appointment of a receiver." (Doc. 27, 29.) Their allegations are not that they refrained from seeking bankruptcy protection. They instead only allege that it was a possible alternative. To maintain a claim for promissory estoppel, it must be alleged that they did or

---

[7]

As stated above, Vacation Charters added a bankruptcy alternative in their brief in opposition.

did not take certain actions due to reliance on the promise and Vacation Charters has failed to do so.

### 4.      Fraud in Inducement

Vacation Charters's Amended Complaint alleges their justifiable reliance that the promises made would be fulfilled "if Vacation Charters withdrew its Petition to Strike Off and/or Open the Judgment by Confession and for Stay of Execution in the Vacation Charters' action and Vacation Charters consented [sic] to the Receiver Action and the appointment of a receiver." (*Am. Compl.,* ¶ 158.) Vacation Charters alleges injury from the reliance on the representations "because [Textron] has failed to deliver on its promises and Vacation Charters has waived its right to withdraw its Petitions to Open/Strike Judgment by Confession . . .or object to the Receiver Action and the appointment of a receiver when Vacation Charters otherwise could have successfully opened/and or struck and opposed the Receiver Action and the appointment of a receiver." (*Id.* at ¶ 159.)[8] Textron moves to dismiss Vacation Charters's claim for fraud in the inducement in Count IV of the Amended Complaint arguing that the alleged promises could not have been justifiably relied on as an inducement to consent to a receiver because Vacation Charters had already agreed to a receiver. (Doc. 26, 31.) Textron additionally argues that the claims are not pled with the

---

[8]

In their brief in opposition, Vacation Charters appears to abandon their contention that they would have been successful in their efforts to open or strike the confession of judgment. (Doc. 27, 24.) This Court issued a Memorandum and Order on March 7, 2012 in related action No. 11-CV-1957 denying Vacation Charters's request to open or strike the judgment. As this Order is a matter of public record, I can consider the order in this current case. Therefore, any contention that Textron made promises to dissuade Vacation Charters from not seeking to open or set aside or withdraw their motion is without merit because there was a judgement on the matter two years prior to the filing of the Amended Complaint. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.").

required particularity under Federal Rule of Civil Procedure 9(b) and that the claims are time-barred. (*Id.* at 26-27.)

"The elements of fraud in the inducement are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 2005 PA Super 141, ¶ 18, 874 A.2d 1179, 1185 (2005) (citation omitted).

Vacation Charters has not alleged that they were fraudulently induced into entering into any agreement by Textron's promises. Instead they allege that "Discovery will show that [Textron] made certain promises to Vacation Charters in an effort to dissuade it from declaring bankruptcy and agree to the appointment of a receiver."[9] (Doc. 27, 31.) Viewing the evidence in the light most favorable to Vacation Charters, ignoring that it was not pled in the Amended Complaint, the alleged promises could be deemed sufficient to induce Vacation Charters to refrain from seeking bankruptcy prevention. However, it is not the case that any alleged promises could have been the inducement for Vacation Charters to oppose the appointment of the receiver. As stated above, Vacation Charters had previously consented to the appointment of a receiver upon default. Even if promises were made by Textron, the consent to appointment of a receiver was a moot point upon default.

Further, Vacation Charters has stated no more than conclusory allegations that the appointment of the receiver was the proximate cause of their harm. "A party claiming fraud in the inducement must demonstrate that the fraud proximately caused economic harm."

---

[9]

As stated above, Vacation Charters's argument that bankruptcy was a viable alternative was alleged for the first time in their brief in opposition.

*Eigen*, 2005 PA Super at  ¶ 39, 874 A.2d at 1190. Vacation Charters fails to allege how, if they were successful in objecting to the appointment of the receiver, despite their prior consent, the outcome would have been different. Simply to state that they would have otherwise sought the protection of bankruptcy court had it not been for the promises made, does not plead a claim for fraud in the inducement because there must be harm caused by the action or inaction claimed to have been induced by the fraud.

Vacation Charters's claim will be dismissed for failure to plead their claim with particularity as required by Federal Rules of Civil Procedure Rule 9(b). Rule 9 provides:

**"**In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Allegations must be supported with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) *overruled on other grounds by Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008). However, "the Third Circuit has cautioned against focusing too narrowly on Rule 9(b)'s particularity language." *Mendelsohn, Drucker & Associates v. Titan Atlas Mfg., Inc.*, 885 F. Supp. 2d 767, 786-87 (E.D. Pa. 2012) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984)). "Instead, a court should focus on whether the complaint 'adequately describes the nature and subject of the alleged misrepresentation.'" *Mendelsohn*, 885 F. Supp. 2d at 786-87 (citing *Seville,* 742 F.2d at 79.)

Vacation Charters alleges that "during the Summer 2011 through the Winter 2012" the alleged promises were made. (*Am. Compl.* ¶¶ 116-119.) Vacation Charters counters Textron's argument that the claim is plead with sufficient particularity and that the Court should be "sensitive" to the application of Rule 9(b) prior to discovery because the rule "may permit sophisticated defrauders to successfully conceal the details of their fraud." (Doc. 27, 33 (citing *Christidis v. First Pa. Mortg. Trust*, 717 F. 2d, 96, 99 (3d Cir. 1983).)   However,

Vacation Charters has not provided any further factual detail with regard to who made such promises, to whom they were made, and when more specifically, over the months-long span, were the promises made. Vacation Charters is in the best position to provide such details as participants in those conversations and they have failed to do so. Due to the lack of particulars, the pleading does not meet the requirements of Rule 9(b).

### a. Standing

Textron additionally argues that Vacation Charters does not have standing to claim that promises were not kept to their detriment because they were not the beneficiaries of any alleged promises under their claim for fraud in inducement. (Doc. 26, 32.) Textron argues that "[a]ll of the benefits are alleged to have been promised by [Textron] to other people or entities: a promise to convey Mountain Laurel to a 'Kalins Purchaser," to relieve one of [Vacation Charters]'s principals from loan guarantees, and to pay that principal for collecting receivables." (*Id.*) Vacation Charters fails to address this claim. Based on the determination above that the claim will be dismissed, this contention will not be discussed further.

### b. Time Barred

Textron asserts that Vacation Charters's fraud in inducement claims are time-barred because the receiver was appointed on November 9, 2011 and the current suit was not filed until October 29, 2014, almost three years later. (Doc. 26, 34.)  A fraud claim, under Pennsylvania law, must be commenced within two years.[10] As stated above, Vacation Charters asserts that the discovery rule applies. (Doc. 27, 34.) Because it is not clear on the

---

[10] The following actions and proceedings must be commenced within two years:
. . .
(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

42 Pa. Stat. Cons. Stat. Ann. § 5524 (West).

face of the complaint if the action is barred by the statute of limitations, the claim will not be dismissed as time-barred, but rather for the other reasons stated herein.

### 5.      Leave to Amend

Textron requests that Vacation Charters's claims be dismissed with prejudice and that they be precluded from amending their complaint. (Doc. 26, 38-39.) Textron contends that further amendment would be futile due to the legal bars asserted by Textron. (*Id.*) Because Vacation Charters has already amended their pleading in this action once as a matter of course, the proposed amendment is governed by Rule 15(a)(2) of the Federal Rules of Civil Procedure.  Rule 15(a)(2) states: "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  But, "[t]he policy favoring liberal amendment of pleadings is not . . . unbounded." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990).  Whether to grant or deny a motion for leave to amend lies within the discretion of the district court. *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).  "[A] district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005).

Vacation Charters does not specifically request leave to file a second amended complaint, however, they argue that the "First Amended Complaint should not be dismissed with prejudice." (Doc. 27, 39.)  Based on the foregoing analysis, it would be futile for Vacation Charters to amend their complaint. Vacation Charters's claim for duress is not only inadequately pled but also, the claim is precluded by res judicata. Vacation Charters's claim for unjust enrichment is also inadequately pled and is precluded by the valid agreement between the parties. Vacation Charters's claim for promissory estoppel was not sufficiently pled and will not benefit from amendment based on the parties' prior agreement for the appointment of a receiver. Finally, notwithstanding Vacation Charters's failure to plead the fraud in the inducement claim with particularity, the claim fails due to the parties' prior

agreement to the appointment of the receiver. Therefore, Vacations Charters's claims will be dismissed with prejudice.

### III. Conclusion

For the above stated reasons, Textron's motion to dismiss will be granted and Vacation Charters' claims will be dismissed with prejudice.

An appropriate order follows.


 January 28, 2016                                    /s/ A. Richard Caputo
Date                                                 A.  Richard Caputo
                                                     United States District Judge